# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **INTERNATIONAL MARINE, LLC ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **No. 15-1446** |
| | **C/W No. 17-8158** |
| **INTEGRITY FISHERIES, INC.** | **SECTION I** |
| | **REF: BOTH CASES** |

## ORDER & REASONS

Before the Court are cross-motions for summary judgment filed by plaintiff Tesla Offshore, LLC ("Tesla") and defendants Atlantic Specialty Insurance Company/OneBeacon Insurance Company ("OneBeacon") and New York Marine & General Insurance Company ("NYMAGIC"). Despite insisting that they are entitled to coverage from OneBeacon and NYMAGIC, plaintiffs International Marine, LLC and International Offshore Services, LLC (collectively "International") have not filed any motions for summary judgment. For the following reasons, OneBeacon and NYMAGIC's motions are granted, and Tesla's motions are denied.

## I.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . ., the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (quotation omitted).

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II.

Tesla was hired to conduct an archaeological survey in the Gulf of Mexico. In order to complete the survey, Tesla required two vessels, a "tow vessel" and a "chase vessel." The tow vessel was to travel along the survey grid pulling a towfish attached to a long cable near the bottom of the ocean as it emitted sonar signals. The chase vessel was to operate directly above the towfish and receive its sonar transmissions.

Tesla contracted with International to provide and operate the tow vessel, the M/V INTERNATIONAL THUNDER ("THUNDER"). For the chase vessel, Tesla initially contracted with Integrity Fisheries, Inc. ("Integrity"). However, after its vessel, the F/V INTEGRITY ("INTEGRITY"), developed mechanical problems, Integrity substituted a vessel owned and operated by Sea Eagle Fisheries, Inc. ("Sea Eagle"), the M/V LADY JOANNA ("LADY JOANNA").[1]

Tesla installed its own equipment onto the THUNDER and the LADY JOANNA and assigned Tesla personnel to work onboard the vessels.[2] With respect to the chase vessel, the crew of the LADY JOANNA was responsible for driving the vessel and staying within reach of the towfish. Tesla personnel operated Tesla's towfish tracking equipment.

On November 2, 2012, with the THUNDER towing the towfish and the LADY JOANNA operating above it, the cable pulling the towfish allided with a mooring line of the M/V NAUTILUS ("NAUTILUS"), a mobile offshore drilling unit in use by Shell

---

[1] Integrity and Sea Eagle are sister companies under common leadership. *See Int'l Marine, LLC v. Integrity Fisheries, Inc.*, 860 F.3d 754, 757 n.2 (5th Cir. 2017).
[2] R. Doc. No. 170-1, at 5.

Offshore, Inc. ("Shell"). Following the allision, Shell sued Tesla and International for negligence.[3] A jury awarded $9,041,552 in damages, allocating 75 percent fault to Tesla and 25 percent fault to International.[4]

In the present lawsuit, Tesla and International claimed that they were entitled to indemnity from Integrity and Sea Eagle, arguing that the NAUTILUS allision related to the operation of the LADY JOANNA. Tesla and International also claimed that they were entitled to insurance coverage for liability arising from the allision, because they were insured under the insurance policies that Integrity and Sea Eagle procured from OneBeacon and NYMAGIC.[5]

---

[3] *See Shell Offshore, Inc. v. Tesla Offshore, LLC*, No. 13-6278, R. Doc. No. 1 (E.D. La. Oct. 28, 2013).

[4] *Id.* at R. Doc. No. 295-4.

[5] As the Fifth Circuit observed on appeal,

> This indemnity and insurance lawsuit took a circuitous route . . . . In response to Shell's lawsuit, Tesla and International impleaded Sea Eagle for indemnity. Upon discovering that Integrity may have had an ownership interest in the [LADY] JOANNA, International subsequently filed a separate indemnity lawsuit against Integrity—which was the initiating suit for the present action . . . . The district court concluded that the Sea Eagle indemnity claim in *Shell v. Tesla* was related to the International lawsuit, and thus decided to consolidate the Sea Eagle indemnity claim with the International lawsuit. *Shell v. Tesla* continued as a trial on International and Tesla's fault for the allision with the NAUTILUS, while the International lawsuit was used to settle any indemnity and insurance claims. Thus, the district court dismissed the claims against Sea Eagle from *Shell v. Tesla* and permitted them to be reasserted here, which International did via a second amended complaint and Tesla did via a third-party demand. Tesla then impleaded Sea Eagle's and Integrity's insurers, One Beacon and NY MAGIC.

*Int'l Marine*, 860 F.3d at 758 n.4.

Considering the parties' cross-motions for summary judgment, this Court determined that Tesla and International were not entitled to indemnity from Integrity or Sea Eagle.[6] In reaching its conclusion, the Court looked to language in the underlying contracts, which limited Integrity and Sea Eagle's indemnity obligations to claims "arising out of or related in any way to the operation of any vessel owned, operated, leased, and/or chartered by [Integrity or Sea Eagle]."[7]

The Court reasoned that "the [] NAUTILUS incident did not 'arise out of the operation' of the [] LADY JOANNA in anything but the most attenuated sense; the [] LADY JOANNA was simply there as the chase vessel staying above the sonar towfish as it was towed by the [] THUNDER in the course of Tesla's sonar operation."[8] Therefore, "Shell's claims for damages based on the [] NAUTILUS incident did not arise out of, and are not related to, the operation of the [] LADY JOANNA."[9] Consequently, the Court concluded, Integrity and Sea Eagle owed no indemnity to Tesla or International for liability arising from Shell's claims.[10] Additionally, the Court held that, because there was no indemnity obligation, Tesla and International's claims regarding insurance coverage also failed.[11] Tesla and International appealed.[12]

---

[6] R. Doc. No. 130.
[7] *Id.* at 4.
[8] *Id.* at 10.
[9] *Id.* at 13.
[10] *Id.*
[11] *Id.* at 14–15.
[12] R. Doc. No. 133.

On appeal, the Fifth Circuit affirmed the Court's decision as to the indemnity claims but reversed as to the insurance claims. Regarding the indemnity claims, the Fifth Circuit agreed that the NAUTILUS incident did not arise out of, and was not related to, the operation of the LADY JOANNA and that neither Integrity nor Sea Eagle owed indemnity to Tesla or International.

As the panel stated,

> the summary judgment evidence supports only one finding: the operation of the [LADY] JOANNA was independent of the negligent conduct found to have caused damage to the NAUTILUS. . . . The principal activity of the contract between Tesla and Integrity/Sea Eagle was for Integrity/Sea Eagle to operate the [LADY] JOANNA as a chase vessel—i.e., to navigate the [LADY] JOANNA so that it remained above the towfish. The MSAs are clear that the NAUTILUS's damage must relate to or arise out of the operation of the [LADY] JOANNA before an indemnity obligation arises. Nothing about the [LADY] JOANNA's successful operation as a chase vessel, however, related to Tesla's decisions to redeploy the towfish near the NAUTILUS and take the route back toward the grid that caused an allision with a submerged mooring line. The undisputed evidence shows that Tesla and International were solely responsible for deploying the towfish, positioning the towfish, releasing the appropriate amount of towline dragging the towfish, and choosing the direction in which the towfish would travel. The [LADY] JOANNA's job was simply to follow the THUNDER and stay above the towfish, wherever it may go, which it performed successfully. . . . The [LADY] JOANNA's involvement in such an effort—[the sonar survey]—did not cause the accident and did not contribute to [Tesla's and International's] decision to dr[ive] the [towfish] across [the NAUTILUS's mooring line]. . . . Although the [LADY] JOANNA was still in operation carrying out the joint sonar survey and in position over the towfish at the time of the allision, its indisputably successful operation had no bearing on the decision to redeploy the towfish near the NAUTILUS and cross the NAUTILUS's mooring line.

> Because the summary judgment evidence supports only
> the conclusion that the [LADY] JOANNA's operation made
> no contribution to the negligent act causing the
> NAUTILUS's damages, indemnity is not owed under the
> MSAs.

*Int'l Marine*, 860 F.3d at 759–60.

With respect to the insurance claims, the Fifth Circuit noted that "[a]lthough similarities in the contractual obligations for indemnity and insurance under the MSAs may suggest that indemnity and insurance claims rise and fall together in this litigation, such a parallel is not always the case." *Id.* at 761. "The scope of insurance coverage," the panel observed, "is determined by the language of the insurance policy obtained, which may yield a different result than the indemnity provision in the original contract." *Id.*

The relevant insurance policies, however, were not in the record at the time the Court granted summary judgment. Hence, the Fifth Circuit vacated the dismissal of the insurance claims and remanded the claims for further consideration, noting that "[s]ummary judgment cannot be granted on the insurance claims without first reviewing the insurance policies and determining their scope." *Id.* at 762.

Accordingly, the only question now before the Court is whether Tesla and International are entitled to insurance coverage under the policies issued to Integrity and Sea Eagle by OneBeacon and NYMAGIC.[13] The Court considers each insurer's policy and the scope of its coverage in turn.

---

[13] International previously moved to amend its complaint to include claims against OneBeacon and NYMAGIC. However, because the Court dismissed the insurance claims on summary judgment, it denied leave to amend as futile. Upon reversing the

# III.

"[T]he interpretation of a contract of marine insurance is—in the absence of a specific and controlling federal rule—to be determined by reference to appropriate state law." *Ingersoll-Rand Fin. Corp. v. Employers Ins. of Wausau*, 771 F.2d 910, 912 (5th Cir. 1985). Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code." *Bernard v. Ellis*, 111 So. 3d 995, 1002 (La. 2012). According to the Civil Code, "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code. art. 2046. Additionally, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050.

With respect to insurance contracts, "[t]he parties' intent, as reflected by the words of the policy, determine the extent of coverage." *Elliott v. Cont'l Cas. Co.*, 949 So. 2d 1247, 1254 (La. 2007). Further, "[a]n insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its

---

dismissal of the insurance claims, the Fifth Circuit instructed the Court to reconsider International's motion to amend. *Int'l Marine*, 860 F.3d at 757 n.1. The Court subsequently granted International's motion, and International filed an amended complaint naming OneBeacon and NYMAGIC as defendants. Additionally, the Court instructed Tesla to file a new civil action concerning its insurance claims. Tesla filed a new complaint asserting claims against OneBeacon and NYMAGIC. That action was then consolidated with the instant case.

provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Bernard*, 111 So. 2d at 1002. "If the policy wording at issue . . . unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003).

## A.

The relevant insurance obligations are set out in the two master services agreements ("MSAs") that Tesla entered into with Integrity and Sea Eagle.[14] The identical MSAs read, in relevant part:

> **INSURANCE**
>
> a.     Except as otherwise provided herein, Contractor [Integrity/Sea Eagle] shall, at its sole cost and expense, procure and maintain, in force at all times during the term hereof sufficient insurance or Company [Tesla] approved self-insurance (i) as may be required by law, and (ii) to protect Contractor [Integrity/Sea Eagle] and Company [Tesla] from third party claims arising out of or connected with the performance of Service hereunder.   All such insurance shall be written with companies satisfactory to Company [Tesla] and shall be of the types and in the minimum amounts specified in **Exhibit "A"**.
>
> b.     All insurance policies of Contractor [Integrity/Sea Eagle] related to Services shall, to the extent of the risks and liabilities assumed by Contractor [Integrity/Sea Eagle] in this Agreement, (i) provide a minimum of thirty (30) days notice to Company [Tesla] prior to cancellation or material change, (ii) except for Workers' Compensation coverage, name Company Group [including Tesla and International] as an additional assured; (iii) contain a waiver of subrogation as to Company Group [including Tesla and International]; and (iv) be considered primary insurance in relation to any other insurance providing

---

[14] R. Doc. No. 168-5 ¶ 11; R. Doc. No. 168-6 ¶ 11.

coverage to any member of Company Group [including Tesla and International].

**B.**

**i.**

Pursuant to its obligations under the MSA, Integrity obtained from OneBeacon a marine comprehensive liability ("MCL") policy.[15]  Neither Tesla nor International are listed as named insureds on the policy.[16]  Thus, Tesla and International are only entitled to coverage under the OneBeacon policy if they qualify as additional insureds under the policy's terms.

Section IV of the OneBeacon policy defines "who is an insured."[17]  A later endorsement to the policy then modifies that definition.  That endorsement states, in pertinent part:

---

[15] R. Doc. No. 168-7.

[16] Integrity is the only named insured listed on the policy.  However, in a letter from June 2015, OneBeacon clarified that it would also treat Sea Eagle as an insured under the policy.  *See* R. Doc. No. 170-5, at 38–39.  The Court, therefore, considers both Integrity and Sea Eagle to be insured by the OneBeacon policy.

[17] R. Doc. No. 168-7, at 14–16.

**MARINE COMPREHENSIVE LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ADDITIONAL INSURED AND WAIVER OF SUBROGATION ENDORSEMENT (BLANKET)**

. . .

It is agreed that:

1. Section IV. of the policy (Who is an Insured) is amended to include any person or organization that you are obligated by an "insured contract" to include as Additional Insureds, but only with respect to liability arising out of "your work."[18]

The policy makes clear that "the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy."[19] Further, the policy provides:

"Your work" means:

a.    Work or operations performed by you or on your behalf; and

b.    Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b.    The providing of or failure to provide warnings or instructions.[20]

---

[18] *Id.* at 31.

[19] R. Doc. No. 168-7, at 3.

[20] *Id.* at 28.

Additionally, the policy defines "insured contract" to mean:

> That part of any other written contract or written agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.[21]

Accordingly, for Tesla and International to be considered additional insureds, three criteria must be met. First, Integrity or Sea Eagle must have been obligated to include Tesla and International as additional insureds on the OneBeacon policy. Second, any such obligation must have arisen from an insured contract—that is, a written contract or agreement pertaining to Integrity or Sea Eagle's business under which Integrity or Sea Eagle assumed Tesla and International's tort liability. Third, any liability for which Tesla and International seek coverage as additional insureds must have arisen out of Integrity or Sea Eagle's work—that is, work or operations performed by Integrity or Sea Eagle; performed on Integrity or Sea Eagle's behalf; or involving materials, parts, or equipment furnished in connection with such work or operations.

---

[21] *Id.* at 24–25.

The third of these criteria is dispositive. Even if Integrity or Sea Eagle were bound by an insured contract to include Tesla and International as additional insureds on the OneBeacon policy, the liability for which Tesla and International now seek coverage—*i.e.*, the damage to the NAUTILUS and its mooring line—did not arise out of Integrity or Sea Eagle's work.

As this Court explained in addressing Tesla and International's indemnity claims, "[t]he [NAUTILUS] incident did not 'arise out of the operation' of the [LADY JOANNA] in anything but the most attenuated sense; the [LADY JOANNA] was simply there as the chase vessel staying above the sonar towfish as it was towed by the [THUNDER] in the course of Tesla's sonar operation."[22] The Court also noted that "the [NAUTILUS] incident is not 'related to' the operation of the [LADY JOANNA] merely because the [LADY JOANNA] was 'necessary' or 'integral' to the entire sonar survey operation in the sense that Tesla could not have conducted the survey but for the presence of a chase vessel."[23] Moreover, the Court reasoned that "because Shell's claims did not arise out of and are not related to the operation of the [LADY JOANNA], *a fortiori* they did not arise out of and are not related to the operation of the [] INTEGRITY, a vessel that was not even on the scene" at the time of the allision.[24] Therefore, the Court determined "that Shell's claims for damages

---

[22] R. Doc. No. 130, at 10.
[23] *Id.* at 12.
[24] *Id.* at 13.

based on the [NAUTILUS] incident did not arise out of, and are not related to, the operation of the [LADY JOANNA]."[25]

The Fifth Circuit reached the same conclusion. As it stated, "Tesla and International's negligence, as well as the resulting damage to the NAUTILUS, was independent of the operation of the [LADY] JOANNA." *Int'l Marine*, 860 F.3d at 760. The panel elaborated further:

> Nothing about the [LADY] JOANNA's successful operation as a chase vessel . . . related to Tesla's decisions to redeploy the towfish near the NAUTILUS and take the route back toward the grid that caused an allision with a submerged mooring line. The undisputed evidence shows that Tesla and International were solely responsible for deploying the towfish, positioning the towfish, releasing the appropriate amount of towline dragging the towfish, and choosing the direction in which the towfish would travel. The [LADY] JOANNA's job was simply to follow the THUNDER and stay above the towfish, wherever it may go, which it performed successfully. Tesla's equipment would then relay the position of the towfish. The [LADY] JOANNA's involvement in such an effort—the sonar survey—did not cause the accident and did not contribute to Tesla's and International's decision to drive the towfish across the NAUTILUS's mooring line . . . Although the [LADY] JOANNA was still in operation carrying out the joint sonar survey and in position over the towfish at the time of the allision, its indisputably successful operation had no bearing on the decision to redeploy the towfish near the NAUTILUS and cross the NAUTILUS's mooring line.

*Id.* (internal alterations and quotations omitted). In short, "the [LADY] JOANNA's operation made no contribution to the negligent act causing the NAUTILUS's damages." *Id.* at 761.

---

[25] *Id.*

Put plainly, these decisions definitively establish that the LADY JOANNA had nothing to do with the NAUTILUS incident. Indeed, its operation was "*completely independent* of [Tesla and International's] negligent act." *See id.* (emphasis in original). Further, the provision and operation of the LADY JOANNA was indisputably the only work or operations performed by Integrity or Sea Eagle. Thus, the only work or operations performed by Integrity or Sea Eagle had no bearing on the allision that gave rise to Tesla and International's liability to Shell. Necessarily, then, Tesla and International's liability to Shell did not arise from Integrity or Sea Eagle's work. Accordingly, the third criteria of the additional insured endorsement is not met, and neither Tesla nor International qualify as additional insureds under the terms of the OneBeacon policy. Tesla and International are, therefore, not entitled to coverage by OneBeacon.

Despite the seemingly straightforward nature of this conclusion, Tesla and International nevertheless insist that they are owed coverage. Emphasizing that the definition of "your work" found in the OneBeacon policy includes work done "on [Integrity or Sea Eagle's] behalf," Tesla states, in conclusory fashion: "Given that the LADY JOANNA was chartered to Tesla and performing services for Tesla pursuant to the MSA, Tesla is an 'additional insured' under the blanket 'additional insured' endorsement in the MCL Policy."[26] What Tesla fails to explain, however, is how any work related to the NAUTILUS incident was being done on Integrity or Sea Eagle's

---

[26] R. Doc. No. 170-1, at 20.

behalf. By Tesla's own admission, the LADY JOANNA was "performing services for Tesla."

Put another way, the LADY JOANNA was doing work on behalf of Tesla, not the other way around. As OneBeacon notes, "[n]o one was performing work or operations on behalf of Sea Eagle or Integrity."[27] And, as previously discussed, the work or operations performed by Integrity or Sea Eagle did not give rise to Tesla or International's liability, and no materials, parts, or equipment furnished in connection with such work or operations contributed to said liability. Tesla's argument, therefore, fails.

Likewise, International's contentions concerning the definition of "your work" are unavailing. First, International reminds the Court that "indemnity and insurance obligations are wholly separate and independent."[28] "Thus[,] the indemnity ruling does not foreclose coverage as an additional insured."[29] Tesla echoes this argument at various points in its briefing.[30]

International and Tesla are correct. Indemnity and insurance obligations are separate issues requiring distinct legal analyses.[31] *See, e.g.*, *Int'l Marine*, 860 F.3d at 761–62 (affirming summary judgment as to indemnity claims but reversing as to

---

[27] R. Doc. No. 171, at 7.
[28] R. Doc. No. 178, at 13.
[29] *Id.*
[30] *See, e.g.*, R. Doc. No. 172, at 10–11.
[31] The MSAs provide as much. *See* R. Doc. No. 170-4, at 65 ("All insurance obligations under this Exhibit shall be independent of the indemnity obligations contained in the contract/agreement and shall apply regardless of whether the indemnity provisions contained in the contract/agreement are enforceable.").

insurance claims); *Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487 (5th Cir. 2000) (interpreting insurance claims apart from indemnity claims). Accordingly, the Fifth Circuit's ruling with respect to the indemnity claims in this case does not mandate an identical outcome for the insurance claims. But neither does it preclude a congruent one.

To say that indemnity and insurance obligations are separate is not to say that they require divergent results. The Fifth Circuit directed this Court to consider Tesla and International's insurance claims in light of the language found in the pertinent insurance policies. In doing so, it noted the possibility "that Tesla and International were added as additional insureds on a policy that provides more coverage than that set forth in" the relevant indemnity provisions. *Int'l Marine*, 860 F.3d 762. Yet it also openly anticipated the possibility "that indemnity and insurance claims rise and fall together in this litigation." *Id.* at 761. Hence, it is entirely possible that Tesla and International are owed neither indemnity nor insurance coverage.

Second, International argues that, because insurance policies are typically construed more broadly than indemnity provisions, "the term 'arising out of' under the [OneBeacon policy]–when read to effect rather than deny coverage–must be interpreted here to mean" that the NAUTILUS allision arose out of the operation of a "Tesla vessel flotilla of which the [LADY JOANNA] was an integral part."[32] The Court is not so persuaded.

---

[32] R. Doc. No. 178, at 13.

As the Court has previously observed, "the [NAUTILUS] incident is not 'related to' the operation of the [LADY JOANNA] merely because the [LADY JOANNA] was 'necessary' or 'integral' to the entire sonar survey operation."[33] Moreover, both this Court and the Fifth Circuit have stated, in no uncertain terms, that the operation of the LADY JOANNA was not connected to the NAUTILUS incident in any significant way. "Tesla and International's negligence, as well as the resulting damage to the NAUTILUS, was *independent* of the operation of the [LADY] JOANNA." *Id.* at 760 (emphasis added). Further, Tesla and International were "solely responsible" for the events leading up to the allision. *Id.* The LADY JOANNA "did not cause the accident and did not contribute to" the decision to drive the towfish across the mooring line. *Id.* In fact, the LADY JOANNA's operation was "indisputably successful" and it "*made no contribution* to the negligent act causing the NAUTILUS's damages." *Id.* at 761 (emphasis added). Accordingly, Tesla and International's liability to Shell simply did not "arise out of" Integrity or Sea Eagle's work, even under the broadest reading of that term.

Third, International suggests that it is entitled to coverage because the term "your work" is defined in the OneBeacon policy to include "[t]he providing of or failure to provide warnings or instructions."[34] International states that "[o]ne of the central contentions in this case has been that the potential liability of the LADY JOANNA lay principally in the failure to warn Tesla and/or International that the vessels were

---

[33] R. Doc. No. 130 at 12.
[34] R. Doc. No. 178, at 13.

coming too close to the DEEPWATER NAUTILUS in time for the incident to have been avoided." Hence, in International's view, its liability to Shell did arise out of Integrity or Sea Eagle's work—namely, Integrity and Sea Eagle's purported failure to provide warnings.

At the outset, the Court notes that Sea Eagle did provide a warning that the THUNDER was problematically close to the NAUTILUS some 30 to 45 minutes before the towfish allided with the mooring. *Id.* at 757. As summarized by the Fifth Circuit,

> [t]he precipitating incident for this litigation was an allision between the towfish cable and a submerged mooring line for the NAUTILUS. Prior to the allision, the towfish had experienced technical problems, forcing Tesla to reel it onto the THUNDER for repairs. The THUNDER and the [LADY] JOANNA temporarily went off the grid toward the south until the towfish was repaired and redeployed, at which point the THUNDER turned north, back toward the grid, followed by the [LADY] JOANNA. According to International, this turn toward the north put both vessels on a course that brought them closer to the NAUTILUS. The [LADY] JOANNA's captain informed Tesla's party chief, who was occupied with the Tesla equipment, that the THUNDER was getting too close to the NAUTILUS. The party chief then radioed the THUNDER to warn of the danger, but his warning was met with assurances that everything was okay. The party chief testified that about thirty to forty-five minutes later the towfish cable allided with the mooring line of the NAUTILUS. The [LADY] JOANNA was over the towfish and the Tesla equipment was sending sonar signals to the THUNDER immediately prior to the allision.

*Id.* The panel went on to find that "the warning from the [LADY] JOANNA's captain to Tesla's party chief that the THUNDER was moving too close to the NAUTILUS was, as the district court correctly concluded, a gratuitous act that has no effect on

the outcome of this litigation."[35]  *Id.* at 761.  Thus, Sea Eagle's warning—or lack thereof—did not give rise to International's liability.

Additionally, with respect to any duty Sea Eagle may have had to provide warnings, the Court agrees with OneBeacon's interpretation of the definition of "your work."  In its reply to International's arguments, OneBeacon states:

> Clearly, "the providing of or failure to provide warning or instructions" relates to "your work" which is "work or operations performed by [Sea Eagle] or on [Sea Eagle's] behalf and materials, parts, or equipment furnished in connection with such work or operations."  Thus, Sea Eagle would only be required to provide warning or instructions in relation to the operation of the LADY JOANNA—not in relation to the operation of the THUNDER or in relation to the sonar survey.

The Court finds this interpretation to be the most logical reading of the plain language in the definition of "your work."

Ultimately, then, Tesla and International have failed to show how their liability arose from Integrity or Sea Eagle's work.  Having not fulfilled this necessary

---

[35]  In its summary judgment opinion, this Court observed:

> Attempting to establish a connection to the operation of the [] LADY JOANNA, International and Tesla mention that the captain of the [] LADY JOANNA noticed the proximity of the [] THUNDER to the [] NAUTILUS and alerted Tesla personnel.  But neither International nor Tesla articulate how this act was a contractual obligation, as opposed to a gratuitous action, of Sea Eagle pursuant to the MSA, or how merely witnessing the [] NAUTILUS incident about to occur made the incident "arise out of" the operation of the [] JOANNA.

prerequisite, they cannot be considered additional insureds under the OneBeacon policy. Tesla and International, therefore, are not entitled to coverage.

### iii.

Assuming *arguendo* that Tesla and International's liability did arise from Integrity and Sea Eagle's work, Tesla and International still fail to meet the criteria required to be considered an additional insured under the OneBeacon policy.

In order for Tesla and International to be additional insureds entitled to coverage by OneBeacon, Integrity or Sea Eagle must have been obligated to include them as additional insureds on the OneBeacon policy. Any obligation to name Tesla and International as additional insureds would come from the MSAs, both of which state, in pertinent part:

> **INSURANCE**
>
> a.      Except as otherwise provided herein, Contractor [Integrity/Sea Eagle] shall, at its sole cost and expense, procure and maintain, in force at all times during the term hereof sufficient insurance . . . (ii) to protect Contractor [Integrity/Sea Eagle] and Company [Tesla] from third party claims arising out of or connected with the performance of Service hereunder. All such insurance shall be written with companies satisfactory to Company [Tesla], and shall be of the types and in the minimum amounts specified in **Exhibit "A"**.
>
> . . .
>
> b.      All insurance policies of Contractor [Integrity/Sea Eagle] related to Services shall, to the extent of the risks and liabilities assumed by Contractor [Integrity/Sea Eagle] in this Agreement, . . . name Company Group [including Tesla and International] as an additional assured . . .[36]

---

[36] R. Doc. No. 168-5 ¶ 11; R. Doc. No. 168-6 ¶ 11.

Thus, Integrity and Sea Eagle were required to acquire insurance to protect themselves and Tesla from claims arising out of or connected to services. As a threshold matter, the parties dispute the meaning of "services."

The recitals to the MSAs provide:

> From time to time, Company [Tesla] desires to contract with independent contractors for the performance of work and/or for the provision of services, which may include the furnishing of labor, equipment, vehicles, vessels, aircraft, tools, instruments, materials, supplies, or other products (collectively "Services").[37]

Tesla puzzlingly insists that "the term 'Services' runs in favor of Tesla, not Sea Eagle or Integrity."[38] It argues that "[t]he intent of the definition of 'Services' is to establish that Tesla, not Sea Eagle or Integrity, desired 'to contract with independent contractors for the performance of work and/or for the provision of services.' Tesla was providing 'Services' to its client and employed the LADY JOANNA to accomplish its 'Services.'"[39] In other words, Tesla invites the Court to look at the very contract under which Integrity or Sea Eagle agreed to perform services for Tesla and somehow arrive at the conclusion that "Services" does not refer to Integrity and Sea Eagle's work, but rather the work Tesla undertook for a third party.

Such a reading of the term "Services," though inventive, borders on the absurd. The definition of "Services" set out in the above recital is clearly tied to the work that Integrity and Sea Eagle contracted to perform for Tesla. After all, the entire purpose

---

[37] R. Doc. No. 168-5, at 1.
[38] R. Doc. No. 172, at 5.
[39] *Id.*

of the MSAs, in which the recital is found, was to arrange for Integrity and Sea Eagle to provide services to Tesla.  The very text of the recital states that Tesla sometimes "desires to contract with independent contractors" like Integrity and Sea Eagle "for the provision of services."

Not to mention, the meaning Tesla ascribes to "Services" cannot be squared with the way the term is used throughout the remainder of the MSAs.  For example, the MSAs state:

- Contractor [Integrity/Sea Eagle] represents that it . . . desires to perform Services for Company [Tesla] in accordance with the terms and conditions of this Agreement.[40]

- This Agreement shall become effective upon the date first written above, or, in the absence of a prior master service agreement between the Parties, the date Contractor [Integrity/Sea Eagle] first commenced Services for Company [Tesla] . . .[41]

- At any time and from time to time during the term of this Agreement, when Company [Tesla] desires Services to be performed by Contractor [Integrity/Sea Eagle], a Company [Tesla] Representative . . . shall give Contractor [Integrity/Sea Eagle] a request for such Services.[42]

- Contractor [Integrity/Sea Eagle] shall thereafter commence the performance of the Services in accordance with the terms and conditions of the Work Request and this Agreement.[43]

- Any and all Services performed by Contractor [Integrity/Sea Eagle] for Company [Tesla] after the Effective date of this Agreement shall be performed pursuant to the terms and conditions of the Agreement.[44]

---

[40] R. Doc. No. 168-5, at 1.

[41] *Id.* at 3 ¶ 2.

[42] *Id.* ¶ 3(c).

[43] *Id.*

[44] *Id.* ¶ 3(f).

The MSAs even go so far as to state that "[i]n Company's [Tesla's] sole discretion, Services may be performed by [Tesla] . . . and such Services shall not be considered to be Services performed pursuant to this Agreement."[45]  If Tesla's definition of services applies, these provisions make little sense.  Tesla's interpretation is, therefore, inapt.

OneBeacon, on the other hand, gives the term "Services" its most natural meaning.  In the MSAs governing services that Integrity or Sea Eagle agreed to provide to Tesla, "Services" means exactly that: services provided by Integrity or Sea Eagle to Tesla.[46]

Applying this definition, Integrity and Sea Eagle were required under the MSAs to insure themselves and Tesla against claims arising from or connected to the performance of "Services," *i.e.*, Integrity and Sea Eagle's "furnishing of labor, equipment, vehicles, vessels, aircraft, tools, instruments, materials, supplies, or other products."  The LADY JOANNA and its crew were the only services proffered to Tesla at the time of the NAUTILUS allision.  The INTEGRITY was not on the scene.  Hence, Integrity's insurance obligations are irrelevant to Shell's claims, and Sea Eagle's obligation was limited to providing insurance for the operation of the LADY JOANNA.

---

[45] *Id.* ¶ 3(g).
[46] Tesla interestingly adopts this definition at one point in its memorandum in opposition to NYMAGIC's motion for summary judgment. *See* R. Doc. No. 187, at 3 ("To the contrary, it was Sea Eagle and Integrity that were providing sonar survey 'Services' to Tesla under the MSAs.").

With regard to this obligation, Sea Eagle was required to name Tesla and International as additional insureds, but only "to the extent of the risks and liabilities assumed by [Sea Eagle] in" the MSA.  Put another way, Sea Eagle had a duty to list Tesla and International as additional insureds, but this duty was limited to those scenarios connected to the risks and liabilities that Sea Eagle agreed to undertake as part of the MSA.  Therefore, the Court must discern the pertinent risks and liabilities the MSA required Sea Eagle to assume.

The risks and liabilities assumed by Sea Eagle are set forth in the liability and indemnity provision of the MSA.  That provision states, in relevant part:

> 9. **LIABILITY AND INDEMNITY**.  In those matters in which a Party is required to indemnify the other Party, the indemnifying Party shall release, protect, defend, indemnify, and hold the indemnified Party and its Group . . . harmless from and against any and all Claims . . . against the indemnified Party or any member of its Group, and shall pay all costs, expenses, fines, penalties, and interest incidental thereto and judgments resulting therefrom (including, without limitation, court costs and reasonable attorneys' fees incurred in the defense of any such Claims).
>
> d. **PROPERTY**
>
> > (i) **CONTRACTOR'S [SEA EAGLE'S] LIABILITY**.  REGARDLESS OF CAUSE, CONTRACTOR [SEA EAGLE] SHALL BE LIABLE FOR, AND HEREBY RELEASES COMPANY GROUP [INCLUDING TESLA AND INTERNATIONAL] FROM ALL LIABILITY FOR, AND SHALL PROTECT, DEFEND, INDEMNIFY, AND HOLD COMPANY GROUP [INCLUDING TESLA AND INTERNATIONAL] HARMLESS FROM AND AGAINST, ANY AND ALL CLAIMS DIRECTLY OR INDIRECTLY ARISING OUT OF ANY LOSS HARM, INFRINGEMENT, DESTRUCTION, OR

> DAMAGE OF CONTRACTOR GROUP'S [SEA EAGLE'S] PROPERTY, EQUIPMENT, OR INSTRUMENTS AND DAMAGES SUSTAINED BY THIRD PARTY PROPERTY OWNERS ARISING OUT OF OR RELATED IN ANY WAY TO THE OPERATION OF ANY VESSEL OWNED, OPERATED, LEASED, AND/OR CHARTERED BY CONTRACTOR [SEA EAGLE] . . . TO PERFORM WORK UNDER THIS AGREEMENT EXCEPT TO THE EXTENT SUCH LOSS, HARM, INFRINGEMENT, DESTRUCTION, OR DAMAGES IS CAUSED BY THE INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.[47]

Accordingly, Sea Eagle assumed the risk and liability of indemnifying Tesla and International for damages to a third party's property "arising out of or related in any way to the operation of any vessel owned, operated, leased, and/or chartered" by Sea Eagle, and it was only obligated to name Tesla and International as additional insureds to such an extent.

As correctly summarized by OneBeacon,

> Integrity [] or Sea Eagle [were] only obligated to defend and indemnify and, thus, only obligated to name as an additional assured, Tesla or International [] for liabilities arising out of operation of a vessel owned, operated, leased, or chartered to Integrity [] or [] Sea Eagle . . . Stated another way, the insurance obligations are linked to, and co-extensive with, the indemnity obligations. The obligation to name Tesla and International as additional assureds is predicated on the allocation of risk under the MSAs. In short, if the indemnity obligations are not triggered, the insurance obligations regarding additional assured status are not triggered.[48]

---

[47] R. Doc. No. 168-5, at 9–11.
[48] R. Doc. No. 168-1, at 14.

This Court has previously held, and the Fifth Circuit has previously affirmed, that neither Integrity nor Sea Eagle owe indemnity to Tesla or International. Consequently, Integrity and Sea Eagle had no obligation to name Tesla or International as additional insureds on the OneBeacon policy for damages resulting from the NAUTILUS incident. As a result, Tesla and International are not entitled to coverage for their liability to Shell.

Notably, Tesla and International fail to address the language in the MSAs that limits Integrity and Sea Eagle's obligation to name them as additional insureds "to the extent of the risks and liabilities assumed by [Sea Eagle]." In any event, the Court is persuaded by OneBeacon's interpretation of that language, which—as OneBeacon argues—is supported by *Becker v. Tidewater*, 586 F.3d 358 (5th Cir. 2009).

In *Becker*, an employee of Baker Hughes was injured while working aboard a vessel operating in the Gulf of Mexico. *Id.* at 363. Baker Hughes was using the vessel pursuant to a time-charter contract with the vessel's owner, Tidewater. *Id.* The employee suffered catastrophic injuries and sued Baker Hughes, Tidewater, and the owner and operator of the oil rig on which the vessel was performing services. *Id.* at 364. After a bench trial, the district court found Baker Hughes to be 55 percent at fault and Tidewater to be 45 percent fault. *Id.* at 365. However, the court found that Baker Hughes had an obligation to indemnify Tidewater, pursuant to an indemnity provision in the time-charter contract. *Id.*

Under the terms of the time-charter contract, Tidewater was to procure insurance to cover its liabilities. *Id.* at 370. The contract further provided that Tidewater's insurance policy "shall include [Baker Hughes], in its capacity as time-charterer of the vessel, as an additional assured, but only with respect to the risks assumed by [Tidewater] in this Charter." *Id.* The policy defined "assured" to "include[] . . . any person, organization, trustee or estate to whom or to which the 'Named Assured' [Tidewater] is obligated by virtue of a contract or agreement to include or name as an assured, co-assured or additional assured." *Id.*

On appeal, Baker Hughes maintained that Tidewater was required to exhaust its liability insurance policies before turning to it for indemnification. This argument turned on whether Baker Hughes could be considered an additional insured under the Tidewater policy—the same issue presented here. *See id.*

Baker Hughes argued it was an additional insured, because Tidewater was obligated to maintain insurance designating it as an additional insured. *Id.* Tidewater argued that, under the time-charter contract's plain language, its duty was "more limited," in that it was only obligated to procure insurance designating Baker Hughes as an additional insured with respect to the risks that it assumed under the time-charter. *Id.* at 371. In other words, Tidewater contended that, because it did not assume the risk of injury to Baker Hughes employees under the terms of the time-charter contract, it was not required—under the terms of the insurance policy—to name Baker Hughes as an additional insured.

The Fifth Circuit agreed. Reading the "insurance and indemnity provisions of the time-charter contract in conjunction in order to properly interpret the meaning of the contract," the panel noted that "the time-charter contract expressly limit[ed] Tidewater's obligation to designate Baker [Hughes] as an 'additional assured' to 'the risks assumed by [Tidewater]'" in the contract. *Id.* at 370–71. It also observed that "Tidewater's insurance policy, in turn, limit[ed] [Baker Hughes'] status as an 'additional assured' to when Tidewater 'is obligated by virtue of a contract or agreement' to designate Baker [Hughes] as an 'additional assured.'" *Id.* Thus, the Court concluded, "Because Tidewater did not assume the risk of injury to [Baker Hughes' employees], Baker [Hughes] is not an 'additional assured' to Tidewater's insurance for [the Baker Hughes employee's] injuries." *Id.*

The same result is warranted here. The MSA expressly limits Sea Eagle's obligation to designate Tesla and International as additional insureds "to the extent of the risks and liabilities assumed by [Sea Eagle]." Sea Eagle's insurance policy, in turn, limits Tesla and International's status as additional insureds to when Sea Eagle is "obligated by an 'insured contract'" to designate Tesla and International as additional insureds. Therefore, because Sea Eagle did not assume the risk of injury to a third party's property that did not arise out of and was not related in any way to the operation of the LADY JOANNA, Tesla and International are not additional insureds under the OneBeacon policy for the damage caused to Shell.

To summarize, Integrity and Sea Eagle were only required to obtain insurance in order to protect themselves and Tesla from third party claims arising out of or

connected to the provision of "Services." Here, "Services" can only mean the operation of the LADY JOANNA. Hence, Integrity and Sea Eagle had no duty to insure against the third party claim resulting from the NAUTILUS incident, an incident that had nothing to do with the LADY JOANNA's operation. And, if Integrity and Sea Eagle were under no obligation to insure against the third party claim resulting from the NAUTILUS incident, then Integrity and Sea Eagle were not obligated to name Tesla and International as additional insureds for liability arising from such a claim.

Moreover, any duty that Integrity and Sea Eagle did have to name Tesla and International as additional insureds was circumscribed "to the extent of the risks and liabilities assumed by [Sea Eagle] in" the MSA. As the only risks and liabilities assumed by Sea Eagle relative to third party property damage are those "arising out of or related in any way to the operation of" the LADY JOANNA, Integrity and Sea Eagle were not required to list Tesla and International as additional insureds for liability stemming from the NAUTILUS allision, which, again, was wholly independent of the LADY JOANNA's "indisputably successful" operation. *Int'l Marine*, 860 F.3d at 761. Tesla and International, then, are owed no coverage from OneBeacon.[49]

---

[49] As for the last criteria, the Court concludes that the MSAs are "insured contracts." Under the definition set forth in the OneBeacon policy, to be insured contracts, the written MSAs must pertain to Integrity and Sea Eagle's business and require Integrity and Sea Eagle to assume the tort liability of another party. The first of these criteria is easily met, as the MSAs clearly relate to Integrity and Sea Eagle's business. Thus, the critical question is whether, under the MSAs, Integrity and Sea Eagle assumed Tesla and International's tort liability.

**iv**.

In sum, Tesla and International fail to satisfy the OneBeacon policy's definition of additional insured, which extends coverage to those that Integrity and Sea Eagle were required by an insured contract to include as additional insureds, but only with respect to liability arising out of Integrity and Sea Eagle's work. Though the MSAs in place between Tesla and Integrity and Sea Eagle are insured contracts as defined by the OneBeacon policy, Integrity and Sea Eagle were not obligated to name Tesla and International as additional insureds for liability stemming from the NAUTILUS allision. Furthermore, the liability for which Tesla and International seek coverage clearly did not arise out of Integrity or Sea Eagle's work. Accordingly, Tesla and

---

Integrity and Sea Eagle assumed Tesla and International's tort liability under the indemnity provisions of the MSAs. Section 9(d)(i) of the MSAs, for example, required Integrity and Sea Eagle to protect, defend, indemnify, and hold Tesla and International harmless from any claims for damages to third party property regardless of cause, provided that such claims arose out of or were related in any way to the operation of the LADY JOANNA and were not the result of Tesla or International's gross negligence or willful misconduct.

Under the MSAs' terms, such a requirement would apparently apply to claims for third party property damage resulting from Tesla or International's mere negligence, so long as a sufficient connection to the LADY JOANNA was found to exist. OneBeacon effectively concedes as much. In arguing that the MSAs are not insured contracts, OneBeacon states that Integrity and Sea Eagle "did not agree to assume [Tesla and International's] tort liability unless that liability arose out of the operation of the LADY JOANNA." Implicit in that statement is an admission that Integrity and Sea Eagle agreed to assume Tesla and International's tort liability, at least in some circumstances. Hence, Integrity and Sea Eagle assumed Tesla and International's tort liability, and the MSAs are insured contracts.

International are not additional insureds under the OneBeacon policy. They are, therefore, not entitled to coverage from OneBeacon.[50]

## C.

### i.

Tesla and International also seek coverage from NYMAGIC. Pursuant to its MSA with Tesla, Integrity procured a Bumbershoot policy[51] from NYMAGIC for the policy period of February 2, 2012 to February 2, 2013.[52] The only named insured on the policy is "Integrity Fisheries, Inc."[53] The policy was initially drafted to cover the operations of the INTEGRITY. However, the schedule of vessels was later amended to add the LADY JOANNA.[54]

Unlike the OneBeacon policy, the NYMAGIC policy does not contain an additional insured endorsement.[55] Accordingly, as an initial matter, Tesla and International must fall within the policy's definition of "assured" in order to be entitled to coverage.[56] The policy's definition of "assured" states, in relevant part:

---

[50] Because the Court concludes that Tesla and International are not additional insureds under the OneBeacon policy and are thus precluded from obtaining coverage from OneBeacon, it need not address OneBeacon's arguments regarding policy exclusions and conditions that might otherwise bar coverage.

[51] "The 'bumbershoot' policy is a marine 'umbrella cover,' which provides general liability coverage of a marine nature. The bumbershoot policy is excess of the underlying insurance policies scheduled on the policy." Robert T. Lemon, II, *Allocation of Marine Risks: An Overview of the Marine Insurance Package*, 81 TULANE L. REV. 1467, 1489 (2007).

[52] R. Doc. No. 185-6, at 2.

[53] *Id.*

[54] *Id.* at 48.

[55] *See id.*; R. Doc. No. 185-1, at 10.

[56] *Id.* at 3 ("This policy is to indemnify the "Assured" in respect of the following . . .").

B. <u>ASSURED</u>   The unqualified word "Assured", wherever used in this Policy, includes not only the Named Assured but also:

> b.   any person, organization, trustee or estate to whom the Named Assured [Integrity] is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this policy, but only in respect of operations by or on behalf of the Named Assured [Integrity].[57]

This definition is unambiguous, and it provides for a clear resolution of the instant motion. For Tesla and International to be owed coverage by NYMAGIC, Integrity must have been obligated by a written contract or agreement to provide them with insurance of the type provided by the NYMAGIC policy. And, to the extent such an obligation existed, Tesla and International are only insured for liability in respect of operations performed by Integrity or on Integrity's behalf.

**ii.**

The first of these criteria appears to be met. Pursuant to the MSA, Integrity was required to provide Tesla with "insurance such as is afforded by [the NYMAGIC] policy." Specifically, Section 11(a) of the MSA required Integrity to provide insurance to protect itself and Tesla from third party claims arising out of or connected with the performance of services, *i.e.*, the provision and operation of the LADY JOANNA. Section 11(a) states that all such insurance shall be of the types and in the minimum amounts specified in Exhibit A. Exhibit A requires the procurement of excess (or

---

[57] *Id.* at 5.

umbrella) liability insurance.[58]  The NYMAGIC policy provides such insurance. Accordingly, Integrity was obligated to furnish Tesla with the type of insurance offered by the NYMAGIC policy.

### iii.

The second criteria, however, is not met.  Under the clear terms of its policy, NYMAGIC agreed to consider as an assured any organization to which Integrity was obligated to provide insurance of the type specified in the NYMAGIC policy.  But NYMAGIC limited this assurance.  Insurance of those organizations qualifying as assureds under the policy would apply "only in respect of operations by or on behalf of" Integrity.  "In respect of" means "as regards, as relates to; with reference to." *Oxford English Dictionary* (3d ed. 2010); *see also*, *In Regard To*, BLACK'S LAW DICTIONARY (6th ed. 1990) (defining "in regard to" to mean "concerning, relating to; in respect of; with respect to; about").  Accordingly, assuming Integrity was bound by a contract to procure insurance of the type offered by NYMAGIC's policy for the benefit of Tesla and International, Tesla and International would be considered assureds under such a policy, but only as related to work by Integrity or on Integrity's behalf.

Tesla and International's liability to Shell, however, simply did not relate to work performed by Integrity or on Integrity's behalf.  Nor did it relate to work by Sea Eagle or on Sea Eagle's behalf.  Again, the INTEGRITY was not on the scene of the NAUTILUS allision, and the only work performed by Sea Eagle at that time was the

---

[58] R. Doc. No. 168-13, at 2–3.

provision and operation of the LADY JOANNA, whose "indisputably successful" operation was "independent" of the NAUTILUS incident. *Int'l Marine*, 860 F.3d at 759. Further, under the terms of the MSAs, Integrity and Sea Eagle contracted to perform services on Tesla's behalf. No work was completed on Integrity or Sea Eagle's behalf. Thus, the damage to the NAUTILUS did not concern work by Integrity or Sea Eagle or on Integrity or Sea Eagle's behalf. Consequently, Tesla and International do not meet the definition of assured under the NYMAGIC policy, and they are not entitled to coverage.[59]

## IV.

Finally, International argues that—regardless of whether it is owed coverage under the OneBeacon or NYMAGIC policy—it was entitled to a defense from both insurers.[60]

"Under Louisiana law, an insurer has a duty to defend its insured unless the allegations in the complaint unambiguously exclude coverage." *Alert Centre, Inc. v. Alarm Protection Services, Inc.*, 967 F.2d 161, 163 (5th Cir. 1992). "Coverage is determined by comparing the allegations in the complaint with the terms of the policy, and the court is to look only at the face of the complaint and the insurance contract in reaching this determination." *Id.* "The insurer has a duty to defend its insured if the complaint discloses the possibility of liability under the policy." *Id.*

---

[59] Because the Court concludes that Tesla and International are not insureds under the NYMAGIC policy and are, therefore, precluded from obtaining coverage from NYMAGIC, it need not address NYMAGIC's arguments regarding policy exclusions and conditions that might otherwise bar coverage.

[60] R. Doc. No. 178, at 16; R. Doc. No. 189, at 9.

Additionally, "[a] liability insurer's duty to defend and the scope of its coverage are separate and distinct issues. . . . [Further,] the obligation of a liability insurer to defend suits against its insured is generally broader than its obligation to provide coverage for damages claims." *Mossy Motors, Inc. v. Cameras Amer.*, 898 So.2d 601, 606 (La Ct. App. 4th Cir. 2005).

Accordingly, International contends that "at minimum, [it] is entitled to a defense" from OneBeacon and NYMAGIC. In support of this argument, International selectively quotes from a single allegation made against Sea Eagle in connection with the *Shell* litigation.[61] Interestingly, that allegation was made by International itself in its third-party complaint. It states, in full:

> Nonetheless, in the event that the alleged incident is determined to be the fault of any vessel involved in the seismic surveying work, International avers that Sea Eagle must bear primary responsibility for any such acts or omissions of negligence, including but not limited to failing to keep a proper watch on the "sonar fish" and/or the proximity of the "sonar fish" to the Shell mooring system, and/or any other acts or omissions of Sea Eagle or unseaworthiness of the [] LADY JOANNA as may be established at the trial of this matter.[62]

International argues that this assertion, taken as true, required OneBeacon and NYMAGIC to provide a defense to it in the *Shell* matter.[63] In effect, this argument boils down to something like this: because International asserted claims against Sea Eagle by way of a separate third-party complaint, OneBeacon and NYMAGIC had a

---

[61] *Id.*
[62] R. Doc. 178-6, at 7–8 ¶ 32.
[63] *See id.*

duty to defend International against the allegations made against it in Shell's original complaint, a complaint that, notably, did not assert any claims against Sea Eagle.

International's argument fails. For one, the aforementioned allegation was made against Sea Eagle by International. Thus, any duty to defend would, logically, be due to Sea Eagle, not International. Moreover, to be entitled to a defense, International would have to be an insured under the OneBeacon and NYMAGIC policies. As stated herein, International is not an insured under either policy. International is, therefore, not entitled to a defense from OneBeacon or NYMAGIC. *See Hanover Ins. Co. v. Superior Labor Servcs., Inc.*, No. 14-1933, 2017 WL 2984867, at *12 (E.D. La. July 12, 2017) (Morgan, J.) ("Because Allied cannot meets its burden of proving its status as an additional insured under the 2000-2001 Lexington Policy, Lexington owes Allied no defense . . . .").

## V.

For the foregoing reasons,

**IT IS ORDERED** that OneBeacon's motions for summary judgment with respect to coverage for Tesla and International are **GRANTED** and that all claims against OneBeacon set forth by Tesla and International in the above-captioned matters are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Tesla's motion for summary judgment with respect to coverage by OneBeacon is **DENIED**.

**IT IS FURTHER ORDERED** that NYMAGIC's motions for summary judgment with respect to coverage for Tesla and International are **GRANTED** and

that all claims against NYMAGIC set forth by Tesla and International in the above-captioned matters are **DISMISSED WITH PREJUDICE**.

 **IT IS FURTHER ORDERED** that Tesla's motion for summary judgment with respect to coverage by NYMAGIC is **DENIED**.

 New Orleans, Louisiana, February 28, 2018.

_____
   **LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**